515 So.2d 55 (1986)
Richard David KINDER
v.
STATE.
6 Div. 633.
Court of Criminal Appeals of Alabama.
December 9, 1986.
Rehearing Denied June 9, 1987.
Certiorari Denied October 2, 1987.
*57 Richard S. Jaffe, Birmingham, for appellant.
Charles A. Graddick, Atty. Gen., and P. David Bjurberg and William D. Little, Asst. Attys. Gen., for appellee.
Alabama Supreme Court 86-1225.
McMILLAN, Judge.
The State petitioned the Juvenile Court of Jefferson County to certify the defendant to stand trial as an adult for a violation of § 13A-6-2, Code of Alabama (1975), Alabama's murder statute. Following a hearing, the case was transferred to the Circuit Court for Jefferson County, wherein the defendant was found guilty of capital murder, as charged in the indictment, and the jury recommended death by electrocution. Pursuant to § 13A-5-47, Code of Alabama (1975), the court held a sentencing hearing and, after reviewing the evidence, case law, and aggravating and mitigating circumstances, found that the mitigating factors outweighed the aggravating circumstances and, therefore, sentenced the defendant to life without parole. The defendant raises nine issues on appeal.
The victim's father testified that he last saw his daughter on the evening of October 20, 1983, as she was preparing to leave the house on a date with Chuck Leonard. The father testified that he gave his daughter two $20 dollar bills before she left. He further testified that the next time he saw her, she was dead.
Chuck Leonard testified that the victim was his girl friend and that they had a date on the evening in question to go to some haunted houses in Trussville. He further testified that they were unable to locate a certain haunted house, and that on their return to Birmingham, a car began driving closely behind them with its bright lights on. Leonard testified that, believing the car to be driven by a friend, he pulled the car that he was driving over to the left and, when the other car passed by them, he pulled up into a circle in order to "park." He further stated that while they were "parking," two people approached the car, and he identified the appellant as one of these people. He testified that they approached the car from the driver's side and that the other person, whom he later came to know as "Duren," told them to get out of the car. Duren pointed a pistol at them, while the appellant walked to the other side of the car and began looking in and under the front seat. Leonard testified that the appellant removed the victim from the car and that she, along with Leonard, were moved around to the trunk. At that point, Leonard testified, he noticed that the appellant had a knife that was approximately five to six inches long. He further testified that the appellant took the keys to the car and unlocked the trunk, making Leonard and the victim get inside. Leonard testified that he observed a car at the bottom of the circle before the defendant closed the trunk. Leonard testified that the car was driven for a few minutes and then was stopped again, whereupon he heard some scuffling and heard the car door being shut again. They then drove on for approximately 30 to 40 minutes, stopped again, and Leonard heard the word "robbery" used after he heard the persons in the car order some food. Leonard testified that he had difficulty hearing their conversations, because the radio was turned up all the way. The car then drove off "real quick-like" for approximately 30 to 40 minutes again and, when the car was stopped, the defendant opened the trunk and had some rope in his hand. Duren had a gun in his hand, and the defendant ordered the victim and Leonard out of the trunk. The defendant physically moved Leonard and the victim three to four feet behind the trunk and tied them back-to-back. Leonard testified that the defendant did these acts without any instructions from Duren. Leonard was tied so that he faced the bumper and the victim faced *58 away. He further testified that the defendant went to the trunk and got the victim's purse, removed the two $20 dollar bills from it, and held them up so that Duren could see them. Without any instructions, the defendant approached the victim and Leonard and turned them around, so that the victim was facing the trunk. Leonard testified that the defendant then approached Duren and something was said that Leonard could not understand, as it was muffled. Leonard further testified that the only thing he could hear the defendant say was "Hurry up." The defendant then walked around to the passenger's side of the car and sat down inside the car. Leonard testified that he looked over his shoulder and observed Duren raise the pistol and shoot approximately five times. He testified that just before the last shot, both the victim and he started gradually sinking to the ground. Leonard testified that he was hit three times: in the leg, in the hip, and in the chest. He testified that, just prior to the shooting, he heard the victim say that she was very scared and that she was going to close her eyes until they left. The defendant and Duren then drove away and Leonard was able to free himself and proceed to get help. There was no one at home at the first house which Leonard approached; however, on reaching the second house, he lay on the porch and a lady said she would call an ambulance. The police and an ambulance arrived at about the same time, and the police escorted the defendant and Duren to the porch, where Leonard identified them.
Deputy Ted Williams, of the Jefferson County Sheriff's Department, testified that he found a bullet and a gold earring lying on the ground at the scene of the crime. Williams then went to Florentine Drive, where he met and spoke with Deputy Schlitz from the sheriff's office and, he testified that as a result of that conversation, found a blue 1983 Oldsmobile parked there and found a .22 caliber revolver that was wrapped up in a paper sack. He found the victim's purse inside the car and some trash from a hamburger establishment. The car was registered to Charles Leonard. Subsequently, Williams lifted some fingerprints from the car, especially from the trunk lid, and sent them to the sheriff's office. Williams testified that later that evening he saw some other officers who were involved in the investigation and that one of these officers, Deputy Ratigan, gave him a "folding-like lock blade knife." Deputy Williams then identified approximately 20 photographs as photographs that he had taken during his investigation.
Deputy Terry Ratigan, of the Jefferson County Sheriff's Department, testified that he had received a call informing him that there had been a murder and that two white male suspects were being sought. Deputy Ratigan testified that he stopped two white males near a high school at approximately 12:45 a.m. He testified that they were on foot. He frisked them for weapons and discovered a knife in the defendant's right rear pants pocket. He then let them go. He further testified that after he received further information and a more detailed description, he again stopped the two suspects, took the knife from the defendant and told them to get in the back of his patrol car. He then drove them to the porch on which Chuck Leonard was lying in order for Leonard to identify them. Deputy Ratigan further testified that he read the defendant his Miranda rights on the second time that he stopped him. He testified that the defendant did not indicate that he wanted a lawyer to be present. He stated that later that night he gave the knife that he had recovered from the defendant to Ted Williams.
Detective M.E. White, of the Jefferson County Sheriff's Department, testified that he read the defendant his Miranda warnings and that the defendant later signed the Miranda form. He further testified that he did not coerce or threaten the defendant to make a statement, and that no one else threatened the defendant. White testified that he again informed the defendant of his rights when he began to tape his statement.
The defendant, Richard David Kinder, testified that on the night in question he and Duren got a rope, and that Duren had *59 a gun and a knife, which he gave to the defendant. He testified that they were going out that night to steal money from something or someone. He testified that when they came upon a parked car on a dead-end circle, Duren handed him the knife. He testified that the rope was to be used to tie up the person that they stole the money from so that they could get away. When they saw the parked car, they turned off their lights, backed out of the circle, and parked at a house up the road. The defendant further testified that Duren told him they were going to where it was parked and steal the car. He further testified that Duren told him that if anyone was in the car, they were going to put them in the trunk. He testified that he walked around and opened the passenger's door in order to check for any guns or other weapons under the seat. The defendant stated that Duren told the two victims that no one would be hurt if they followed instructions. He testified that he ordered the two to get in the trunk of Leonard's car. They drove that vehicle to their car which Duren then drove and left at a shopping center. They then drove to a fast food establishment and ordered a drink; when they drove around to the window, then raised the gun so that it could be seen by the cashier. The cashier screamed, "It's a robbery" or "We're being robbed," whereupon Duren drove off. Thereafter, the defendant said that Duren told him "We had to get rid of them becausethey seen [sic] us and they can identify us." The defendant testified that he suggested that they leave them in the trunk of their car and that they would never be able to identify them; however, Duren then stated that he did not intend to shoot the girl because she had not looked at him. The defendant testified that Duren then instructed him to search them for money and to tie them up, which he did. He further testified that Duren told him to turn the boy so that he was facing Duren. The defendant then walked over to Duren, who instructed him to start the car. The defendant testified that he started the car and got inside. He then heard four or five shots. He testified that Duren got in the car and that he asked Duren, "You didn't shoot them, did you?" Duren replied that he did. They subsequently split the money and hid the gun.

I.
The appellant argues that the trial court erred in refusing to strike certain prospective jurors challenged for cause after a showing of a fixed opinion and probable prejudice. The first prospective juror whom the appellant questioned made statements implying that the defendant would have to be proven innocent and that he could "possibly" abide by the judge's instructions. On voir dire, when asked about his statement indicating that the defendant would have to be proven innocent, the prospective juror stated:
"Well, I feel like if he wasn't indicted there has to be a suspicionsomething for somebody to indict you, the grand jury to indictto indict somebody, right? So, there has to be some kind of facts or whatever. I have never served on a grand jury, but I would assume that before they will indict anybody and bring them to trial, there has to be some kind of evidence."
He further stated, "[H]e wouldn't have to prove he was innocent. But, what I am saying is there is a suspicion there that if he hadn't been indicted by the grand jury, he wouldn't be here." The following also transpired between this juror and the defense counsel:
"JUROR: I don't presume him guilty.
"DEFENSE COUNSEL: No.
"JUROR: I don't presume himwell, let's say I presume him innocent until it is proven that he is guilty.
"DEFENSE COUNSEL: Because that's the law, right?
"JUROR: Right. Now, that is what I am asked to go by, the law....
"DEFENSE COUNSEL: Do you still believe, though, that once a person has been indicted by a grand jury, that there is probably something to it?
"JUROR: Yeah, they'reI would say there was a reason. I'm not saying that the grand jurythey are just like everything else, you know, they are not always *60 right. I would say, yeah, there would probably be something to it or they didn't do their job."
This juror also indicated that he had previously read an article concerning this crime, but that his memory as to its contents was uncertain and that he did not believe everything he read. When the defense counsel questioned this juror concerning a statement he made indicating that he could "somewhat" put everything he had read aside, the juror stated: "Well, you know, you can't draw a blank mind, you can't just disregard everything. I mean, you know, it has to be proven by the State or whatever, you know. I know there is a big burden, you know, on the jurors that listen to this."
The prosecution objected to the other prospective juror's statement indicating that if the defendant was at the scene of the crime and did not try to stop it, then he "ought to hang." On the voir dire examination of this juror, the following pertinent statements were made:
"DEFENSE COUNSEL: If he was involved, is what you saidin other words, he was there, just simply there with the other boy, then I think you said he ought to hang.
"JUROR: If he didn't try to stop it.
"DEFENSE COUNSEL: Right.
"THE COURT: That is where I sustained an objection to that area.
"PROSECUTOR: I object to that, because the courtthe court is going to charge you on what is known as complicity or any other word that he may use, people acting in unison or not acting in unison. You would follow the law, wouldn't you?
"JUROR: Right."
"PROSECUTOR: Okay....
"DEFENSE COUNSEL: If the law says if the law was explained to you about what a person has to do to be an accomplice or be a part of something, in spite of the law as he would explain it to you, if he was one of the two, if he, being Richard Kinder, was there and didn't try to stop it, would you still find him guilty?
"JUROR: No, not if I were instructed by the Court. Being instructed by the Court as to the law of the State of Alabama, I am bound to go by the law of the State of Alabama, being a law-abiding person. Even though I didn't feel personally like that is the way it ought to go."
The grounds on which a juror may be challenged for cause are set out in § 12-16-150, Code of Alabama (1975). One of those grounds is that a juror "has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict." Furthermore, grounds for challenge for cause under the common law still exist where they are not inconsistent with § 12-16-150. Stewart v. State, 405 So.2d 402, 407 (Ala.Cr.App.1981); Felton v. State, 46 Ala.App. 579, 246 So.2d 467 (1971); Mullis v. State, 258 Ala. 309, 62 So.2d 451 (1952).
"The test to be applied is can the juror eliminate the influence of his scruples and render a verdict according to the evidence. Ordinarily a juror is not disqualified where it appears that he is willing to follow the instructions of law given by the trial court and is able to decide the case impartially according to the evidence notwithstanding his scruples. The determination of this question is based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Tidmore [v. City of Birmingham, 356 So.2d 231 (Ala.Cr.App.1977), cert. denied, 356 So.2d 234 (Ala.1978)]. A juror is incompetent whose answers show that he would follow his own views regardless of the instructions of the court. Watwood v. State, 389 So.2d 549, 550 (Ala.Cr.App.), cert. denied, 389 So.2d 552 (Ala.1980)."
Barbee v. State, 395 So.2d 1128, 1130-31 (Ala.Cr.App.1981). Thus, a mere expression of opinion which is based on rumor does not render a juror incompetent as long as he does not have a fixed opinion which would bias his verdict. Blevins v. State, 20 Ala.App. 229, 101 So. 478 (1924). "A juror, even though having previously expressed an opinion regarding a defendant's guilt, is not disqualified if he states unqualifiedly *61 that as a juror he can find a true verdict on the evidence alone. Willingham v. State, 262 Ala. 550, 80 So.2d 280 (1955)." Johnston v. State, 497 So.2d 844 (Ala.Cr.App. 1986).
"Thus, where a juror states that he has opinions but that he would try the case fairly and impartially according to the law and the evidence and that he would not allow his opinion to influence his decision, it is not error for a trial judge to deny a challenge for cause. Howard v. State, 420 So.2d 828, 831 (Ala.Cr.App. 1982). `A juror who brings his thoughts out into the open in response to voir dire questions may be the one who later "bends over backwards" to be fair....' Clark v. State, 443 So.2d 1287, 1289 (Ala. Cr.App.1983)."
Mahan v. State, 508 So.2d 1180 (Ala.Cr. App.1986).
Thus, a prospective juror need not be excused merely because he knows something of the case to be tried or because he has formed some opinions regarding it.
"[T]o say that any man who had formed an opinion on any fact conducive to the final decision of the case would therefore be considered as disqualified from serving on the jury, would exclude intelligent and observing men, whose minds were really in a situation to decide upon the whole case according to the testimony, and would perhaps be applying the letter of the rule requiring an impartial jury with a strictness which is not necessary for the preservation of the rule itself."
LaFave and Israel, Criminal Procedure (1984), § 21.3, quoting John Marshall in United States v. Burr, 25 Fed.Cas. 49 (D.Va.1807).
Furthermore, "[w]hen a common law ground is at issue there must be a showing of absolute bias leaving nothing to the discretion of the trial court, or there must be a mixed question of law and fact to be determined by the trial court exercising its sound discretion. [Citation omitted]" Stewart v. State, supra, at 408. "We find that this case presents a matter within the discretion of the trial court. A trial court's ruling on challenges for cause based on bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion. Price v. State, 383 So.2d 884 (Ala.Cr.App.), cert. denied, 383 So.2d 888 (Ala.1980); Motes v. State, 356 So.2d 712 (Ala.Cr.App.), cert. denied, 356 So.2d 720 (Ala.1978)." Id. Because both of the jurors in the present case stated that they would base their decisions on the evidence and the trial court's instructions, we find that the trial court did not abuse its discretion.

II.
The appellant contends that the trial judge committed reversible error by refusing to instruct the jury on the lesser-included offenses of robbery and kidnapping, because he claims that the evidence supported such an instruction. The record indicates that following the trial court's oral instructions to the jury, the trial court asked for any exceptions, whereupon the defense counsel objected to the omission of the charges on robbery and kidnapping (requested jury charges numbered 14 and 30, respectively) as follows:
"DEFENSE COUNSEL: I object to Your Honor not giving the following instructions that I have requested: Three
"THE COURT: I didn't give any of your instructions.
"DEFENSE COUNSEL: I object to you not giving all of them, and in particular, three, seven, eight
"THE COURT: Some of them I did cover in my charge, I take that back.
"DEFENSE COUNSEL: Nine, ten, twelve, thirteen, fourteen, fifteen, eighteen, twenty, twenty-two, twenty-three, twenty-seven, thirty, thirty-one."
According to Rule 14, Alabama Temporary Rules of Criminal Procedure:
"No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection." *62 Thus, it is clear that in order for the issue of the court's failure to give a requested jury charge to be preserved, the appellant must give the reasons for his objection, as required by Rule 14. Thompson v. State, 473 So.2d 1205, 1208 (Ala.Cr.App.1985). "Defendant must object specifically to each of the charges refused, Curtis v. State, 424 So.2d 679 (Ala.Cr.App.1982), and the grounds assigned must be specific. Rowe v. State, 421 So.2d 1352 (Ala.Cr.App.), cert. denied (1982)." Harbor v. State, 465 So.2d 455, 459 (Ala.Cr.App.1984), writ quashed, 465 So.2d 460 (Ala.1985). The appellant's general objection to the court's refusal of the numbered charges was not sufficient. Id. See also Bell v. State, 473 So.2d 622 (Ala.Cr.App.1985); Vaughn v. State, 473 So.2d 661 (Ala.Cr.App.1985).

III.
The appellant argues that the trial court's refusal to allow the defense access to Charles Leonard's statement to the police constituted reversible error, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. He further alleges that this statement included substantial differences from the trial testimony of Charles Leonard and that those differences were both exculpatory in nature and important for impeachment purposes. The only specific discrepancy that the appellant raises concerns Leonard's statement regarding the conversation between Duren and the defendant prior to the shooting. In his statement to the police, Leonard remarked that this conversation was "whispered real low and I couldn't hear it." He further stated:
"Well, as far as I can remember the words I thought he said were to come on or to hurry up. Then he went around and opened both the front doors and he went and sat in the other side. I guess so they could get away or something. I don't know."
At trial, during the direct examination of Leonard, he stated: "After he turned us around, he went over and they said something, I couldn'tit was muffled, I couldn't understand. And then the only thing I heard him say was, `Hurry up.'"
The defense counsel had transcripts of Leonard's testimony from two prior proceedings, the transfer hearing and the preliminary hearing, which he used extensively to cross-examine Leonard. The following transpired during this cross-examination:
"Q. Chuck, before we broke for lunch, I was asking you a few questions about where you were at the point where you had come back and you folks were taken out of the car and tied up. I think that you said that Kinder, my client, Richard Kinder, had repositioned these people, had come around and had had some words with Duren, the boy that did the shooting.
"A. Yes.
"Q. And then I believe you testified that Duren then got into the automobile. If I am wrong, tell me. He might have said something before that, did he say, `Hurry up' or something?
"A. Yes, he said, `To hurry up.' And he went to get in the car.
"Q. Are you sure the words were `Hurry up.' Or could it have been `Hurry up, let's go'?
"A. No, I am sure.
"Q. Let me, if I could, ask you to focus in on this right here. And if you would, let me ask you if this refreshes your recollection? If you would read along with me silently for a second. `After he' referring to Richard Kinder, my client'After he turned us around, he said something to the effect of, you know, "Hurry up, let's go," you know.'
"Does that refresh your recollection as to what you had said on November the 29th, 1983?
"A. Yes, sir. But the things were very then confused [sic], I knew what I was saying, but like I said, there was so much going on. But the words `Hurry up' were what was said.
"Q. All right. I am not arguing with you, please don't get me wrong, but, I think what you are saying, if I understood what you just said, even though you may have said the words were `Hurry up, let's go,' in November, it was still *63 a confusing time for you and really what was said was, `Hurry up,' am I right on that? "A. Yes, sir.
"Q. Excuse me?
"A. Yes, sir.
"Q. All right. But, `Hurry up, let's go' was not said or something to that effect?
"A. No, sir.
"Q. Let me ask you this, if I could: Do you recall testifying at a preliminary hearing in which David Duren, the boy that did the shooting, where a preliminary hearing was held on this case?
"A. Yes, sir.
"Q. Okay. Now, when you testified to a prior proceeding in this case about Ricky Kinder, it was after the preliminary hearing was held on David Duren?
"A. Yes, sir.
"Q. In other words, the preliminary hearing was held on November 15, 1983 in this courthouse for David Duren?
"A. Yes, sir.
"Q. If you would follow along with me silently for a second, please. I will ask you if
"[PROSECUTOR]: What page are you on?
"[DEFENSE COUNSEL]: I am on page 9.
"Q. I will ask youlet me wait until they turn to that. I will ask you if yougo ahead and read it, if you would. But I'll ask you when Mr. DeCarlo, the gentleman sitting right over there at the counsel table, our District Attorney, was questioning you, if you would read silently between page 3 and page 14, and I will ask you if between
"[PROSECUTOR]: You mean
"Q. Line, I'm sorry. Line three to line fourteen, if that was a description of what occurred at the point where these people, you and [the victim], were tied up if this is the description of what happened?
"A. Yes.
"Q. Now, in describing what happened here, I believe youand correct me if I am wrongyou say you were facing the trunk and she was facing out towards the road?
"A. Right.
"Q. And then you say here, `The seventeen-year-old' referring to Ricky Kinder.
"A. Right.
"Q. `Then came back and turned us around, she was facing the trunk and then I was facing out towards the road, she then told me that she was scared and she was going to close her eyes until they drove off. I looked over my shoulder and could see him raising the gun.
"A. Right.
"Q. `When he started raising the gun, I started turning towardstowards him.' All right. What I am asking you is if at any time during this preliminary hearing proceeding on November the 15th, 1983, if you ever said to anyone that Ricky Kinder said, `Hurry up, or Hurry up, let's go?'
"A. I don'tI don't remember.
"Q. Well, it didn't appear, at least in that portion of the transcript when you described what happened about [sic] he said, `Hurry up' or anything like that?
"A. No, not here."
It appears from the record that the defense counsel made a general request for exculpatory or impeaching information to be produced by the prosecution, which the judge classified as "too broad"; however, there is no further indication that this request was denied. The record also contains a subsequent minute entry granting the defense counsel informal open discovery to Sergeant White, the police officer who took Leonard's statement.
"In order to establish a Brady violation, appellant must prove: `(1) The prosecution's suppression of evidence; (2) The favorable character of the suppressed evidence for the defense; (3) The materiality of the suppressed evidence.'" Knight v. State, 478 So.2d 332, 335 (Ala.Cr.App. 1985). Impeachment evidence, as well as exculpatory evidence, falls within the Brady rule. See Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

*64 "The holding in Brady v. Maryland requires disclosure only of evidence that is both favorable to the accused and `material either to guilt or punishment.' 373 U.S., at 87 [83 S.Ct. at 1196]. See also Moore v. Illinois, 408 U.S. 786, 794-795, 92 S.Ct. 2562, 2567-2568, 33 L.Ed.2d 706 (1972).
The Court explained in United States v. Agurs, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976): `A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.'
"... Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial:
"`For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose....
"`... But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.' 427 U.S., at 108, 96 S.Ct. at 2399."
United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 3379-80, 87 L.Ed.2d 481 (1985). "Pursuant to United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), undisclosed evidence is material under the Brady rule ... only when it is reasonably probable that the outcome of the trial would have been different had the evidence been disclosed to the defense." Hamilton v. State, [Ms. 8 Div. 421, September 9, 1986] (Ala.Cr.App.1986); Spellman v. State, 500 So.2d 110 (Ala.Cr.App. 1986). In the case sub judice, the prosecutor's failure to disclose Leonard's statement to Sergeant White does not constitute a Brady violation. The defendant has failed to satisfy the two-pronged test of Bagley. It is not reasonably probable that the prosecutor's not disclosing Leonard's statement in the present case would have affected the outcome of the trial. Because the defense counsel already had access to the information contained in the statement made by Leonard to Sergeant White, through the testimony of Leonard in the two prior hearings, we find that the result of the trial would not have varied had this information been given to the appellant prior to trial. Furthermore, it is clear that any error in the prosecutor's failure to disclose this statement merely constituted harmless error. Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). "The appellant's guilt was established beyond a reasonable doubt, and access to the [statement] would have been inconsequential to his defense even if the [statement] was subject to discovery. United States v. Hogan, 769 F.2d 1293 (8th Cir.1985); United States v. Keithan, 751 F.2d 9 (1st Cir.1984); United States v. Rodriguez, 765 F.2d 1546 (11th Cir.1985)." Hamilton v. State, 496 So.2d 100 (Ala.Cr.App.1986).

IV.
The appellant argues that the trial court abused its discretion in allowing into evidence repetitive photographs and slides of the deceased victim, because, he claims that the photographs shed no light on the issues being tried.
"Photographs which depict the character and location of external wounds on the body of a deceased victim are admissible even though they are cumulative evidence based upon an undisputed matter. Ellenburg v. State, 353 So.2d 810 (Ala. Cr.App.1977). The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Carpenter v. State, 400 So.2d 417 (Ala.Cr.App.), cert. denied, 400 So.2d 427 (Ala.1981)."
Walker v. State, 416 So.2d 1083, 1090 (Ala. Cr.App.1982). This court has held that photographs of the wound to a deceased victim's head were admissible even though *65 they "were cumulative evidence based on an undisputed matter." Harrell v. State, 470 So.2d 1303, 1306 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.1985), cert. denied, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985), citing Washington v. State, 415 So.2d 1175, 1180-81 (Ala.Cr.App.1982). See also Scanland v. State, 473 So.2d 1182, 1187 (Ala.Cr. App.1985).
Furthermore, the record indicates that the trial court gave instructions to the jury on how to view this evidence, stating:
"Ladies and gentlemen, in homicide litigation, many times photographs are admitted to the jury for purposes, if you deem them to be pertinent to the issues in the case. These photographs do depict unpleasant things, of course, you can imagine that they will, as will the slide presentation that we are about to get into, but I ask you to view these photographs with as detached a frame of mind as you can muster. Do not permit mental inflammation or outrage to encroach into your deliberations. That is not why these photographs are being approved by me to come before you. You examine the photographs with an eye towards resolving the issues in the case and conduct the examination in a cool, detached, dispassionate frame of mind. Can you do that? All right. Go ahead."
We find that the trial court did not abuse its discretion by admitting the photographs.

V.
The appellant claims that there was insufficient evidence presented under the accomplice liability doctrine to convict "someone who was an accomplice merely in an underlying felony rather than an intentional killing, particularly when the doctrine of transferred intent does not apply." The appellant concedes in his brief that he was an accomplice in the underlying felony; however, he cites Womack v. State, 435 So.2d 754 (Ala.Cr.App.), affirmed, 435 So. 2d 766 (Ala.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 87 L.Ed.2d 367 (1983), to argue that because he was a non-triggerman accomplice, the State must prove a "particularized intent" for an intentional murder conviction.
"In reviewing a capital conviction in which the accused concedes at trial that he participated in the underlying felony but denies that he committed or aided and abetted the intentional killing, this Court must apply a two-part test. `To affirm a finding of a "particularized intent to kill", the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.' Ex parte Raines, 429 So.2d 1111, 1113 (Ala.1982)."
Kennedy v. State, 472 So.2d 1092, 1105 (Ala.Cr.App.1984), affirmed, 472 So.2d 1106 (Ala.1985). In the present case, the record clearly indicates that the judge adequately instructed the jury as to the elements of the capital offense, and specifically instructed them that in order to prove intentional murder, the appellant must have had the requisite intent to commit the murder. Because the jury was properly instructed on the relevant law, it must be presumed that they followed the judge's instructions.
"A crucial assumption underlying that system [of trial by jury] is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct the jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed."
Parker v. Randolph, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979).
We further find that the evidence in the case at bar was clearly sufficient for the jury to reasonably conclude that the appellant had the requisite intent to kill. See Watkins v. State, 495 So.2d 92 (Ala.Cr. App.1986). In his confession to the police, the appellant stated that Duren told him that they had to "get rid" of Leonard because he had gotten a good look at the appellant and himself. Furthermore, Charles Leonard testified that the appellant acted without instruction from Duren in *66 positioning Leonard and the victim back to back, tying them together, approaching Duren and saying something, the only words of which Leonard could clearly hear were "Hurry up." The appellant then got in the car, while Duren shot at the victim five times. According to the appellant's confession, when Duren got back into the car he told the appellant that he accidentally shot the victim. There is no merit to the appellant's argument that the girl was not the intended victim, because § 13A-6-2(a)(1), Code of Alabama (1975), defines murder as follows:
"(a) A person commits the crime of murder if:
"(1) With intent to cause the death of another person he causes the death of that person or of another person." (Emphasis added.)
Thus, both prongs of the test established in Ex parte Raines, supra, are satisfied in this case.

VI.
The appellant argues that reversible error resulted from the prosecutor's remark, made during his opening statement, concerning an inflammatory conversation between the co-defendants; the appellant argues that such a conversation never occurred and that the evidence would not support a finding that it did. During his opening statement, the prosecutor remarked:
"Where, ladies and gentlemen, we expect the evidence to be, an execution occurred. That there was some conversation between the two, Kinder and Duren, and that Kinder got out and turned them around just before the execution and that Duren, after Kinder had said, `Hurry up,' and some conversation about who was going to do it. And there was an attempt, we expect the evidence to be, to execute both living witnesses.
"[DEFENSE COUNSEL]: Judge, I want to object.
"[PROSECUTOR]: We expect the evidence to be
"[THE COURT]: Just a moment, Rusty.
"[DEFENSE COUNSEL]: I would like to object to the statement that was just made that there was some conversation as to who was going to do it. I submit there will not be evidence of that. That is an improper statement by the District Attorney and I would like the record to note my objection.
"[THE COURT]: All right. I presume that Mr. Leonard will say something about the subject area, will he not, Rusty?
"[DEFENSE COUNSEL]: I do object to that.
"[THE COURT]: Will he?
"[PROSECUTOR]: Yes, sir.
"[THE COURT]: Overrule."
In Ex parte Baldwin, 456 So.2d 129, 136 (Ala.1984), the Alabama Supreme Court addressed the rules regarding opening statements as follows:
"`Erroneous insistences and prejudicial conduct on the part of district attorneys tend unduly to prejudice and bias the jury against the defendant. It is not permissible for the solicitor to make an emphatic statement that the defendant is guilty of the crime charged. Rowland v. State, 31 Ala.App. 605, 20 So.2d 881 (1945). The prosecution's opening statement to the jury on what it expects to prove should be confined to statements based on facts admissible in evidence. Higdon v. State, 25 Ala.App. 209, 143 So. 213 (1932). Counsel, however, is to be allowed considerable latitude in presenting to the jury in his opening statement what he expects the evidence to show. Rogers v. State, 49 Ala.App. 78, 268 So. 2d 859 (1972). The trial judge must be given wide discretion in determining whether the making of a certain utterance by the District Attorney requires that a mistrial be granted. Ballard v. State, 51 Ala.App. 393, 286 So.2d 68 (1973).' White v. State, 294 Ala. 265, 314 So.2d 857, 861-2 (1975); cert. denied, White v. Alabama, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975); reh. denied, 423 U.S. 1039, 96 S.Ct. 577, 46 L.Ed.2d 415 (1975)." (Emphasis added.) *67 Based on Leonard's statement, the prosecutor could have reasonably expected Leonard to testify that the "Hurry up" comment made by the appellant referred to who was going to do the shooting, as there was apparently further conversation between the defendant and Duren.

VII.
The appellant argues that certain comments to the jury made by the prosecutor in his closing argument were illegal and prejudicial and served only to inflame the passions of the jury and, thus, constituted reversible error. The appellant refers to two instances in the prosecutor's closing argument; the first is as follows:
"You know they said many, many times this is a horrible, horrible case. How many times did he say that? Yet, I have had I don't know how many times, I have yet to hear a number of times they have said something about that poor little girl, that little child. I heard somebody say something else aboutand, you know, the parents of this young man over here. I have a great sympathy for them. But, I heard one thing said during the period of time about how many children and that sort of stuff. I couldn't help but think how many children this lady has
"[DEFENSE COUNSEL]: We object to that.
"[PROSECUTOR]: She only had one child
"THE COURT: Just a minute.
"[PROSECUTOR]: She only has one child now
"[DEFENSE COUNSEL]: Judge
"THE COURT: John, let me hear the objection. State your objection.
"[DEFENSE COUNSEL]: When I objected, he kept on saying something that is not in evidence. Secondly, there is not evidence to that. It is just an argument to invoke more emotion to this terrible event and I object to that.
"THE COURT: Well
"[PROSECUTOR]: Number one, there was evidence, the victim's father testified to the two children and now one. And he is absolutely wrong if he
"[OTHER PROSECUTOR]: He certainly is
"[PROSECUTOR]: the same evidence on both sides.
"[OTHER PROSECUTOR]: that is exactly right, Judge. And I will tell you this, the mother for this accused testified that she had what, eight children? Seven of them were boys and one of them was a girl. This was her baby son. That was the comment I was going to make. This lady right here has a baby
"THE COURT: You lawyers are allowed to comment on the evidence, overruled."
The record indicates that the victim's father testified that he and his wife had two children and that the victim was 16 years old when she was murdered. The comment made by the prosecutor was a legitimate inference drawn from the evidence and, therefore, proper. Weeks v. State, 432 So.2d 528, 530 (Ala.Cr.App.1983); Long v. State, 446 So.2d 658, 661 (Ala.Cr.App.1983); Green v. State, 389 So.2d 537, 541 (Ala.Cr. App.), cert. denied, 389 So.2d 541 (Ala. 1980).
The other allegedly improper comment by the prosecutor in his closing argument was as follows:
"And under that theory of deterrent, there is other little [girls like the victim] down the years and down just the months whose lives will not be wasted because of your backbone here today.
"It will be a thankless job, because you won't know who they are. They won't pat you on the back, because under their theory, it will not have happened.
"[DEFENSE COUNSEL]: Judge, I would like to note another objection. The argument is that punishment for murder is not severe enough, not a deterrent
"THE COURT: I don't understand your objection.
"[DEFENSE COUNSEL]: The emphasis punishment for murder is not a deterrent, and I object to it.

*68 "THE COURT: Overruled."
"In Alabama, the rule is that a district attorney in closing argument may make a general appeal for law enforcement. Embrey v. State, 283 Ala. 110, 118, 214 So.2d 567 (1968)." Ex parte Waldrop, 459 So.2d 959, 962 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). See also Allen v. State, 462 So.2d 1031, 1035 (Ala.Cr.App.1984); Patton v. State, 384 So.2d 19, 23 (Ala.Cr.App.), writ denied, 384 So.2d 23 (Ala.1980); Miller v. State, 380 So.2d 1011, 1012 (Ala.Cr.App. 1980).
"This line of argument is `within the latitude allowed prosecutors in their exhortations to the jury to discharge their duties in such a manner as, not only to punish crime, but to protect the public from like offenses and as an example to deter others from committing like offenses.' Varner v. State, 418 So.2d 961 (Ala.Crim.App.1982); Cook v. State, 369 So.2d 1243 (Ala.Crim.App.1977), affirmed in part, reversed in part on other grounds, 369 So.2d 1251 (Ala.1978)."
Ex parte Waldrop, supra, at 962. See also Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984).
Accordingly, the prosecutor's comments are a proper argument for the necessity of law enforcement as a deterrent to crime and as a protection to society.

VIII.
The appellant contends that the trial judge committed reversible error by overruling his motion to suppress his statement, which he alleges was taken without his being advised of his right to communicate with his parent, guardian or counsel prior to interrogation. A hearing on the motion to suppress was held, wherein Sergeant White testified that he and two other officers were present when the appellant gave his statement and that he read the appellant his Miranda rights prior to the statement being made. He further testified that neither he nor anyone in his presence or to his knowledge abused the appellant or offered him any promises, hopes of reward, or other inducements to gain the statement. Sergeant White also testified that the appellant signed a waiver of rights form, a copy of which was entered into evidence at the hearing. A police officer from Trussville also testified that he was present when the appellant made his statement, that the appellant was read his rights, and that no one threatened or abused the appellant. The trial judge then stated that he was convinced by a preponderance of the evidence that the statement was made voluntarily, knowingly, and intelligently.
In his brief, the appellant contends that the statement was inadmissible because he was not informed that he had a right to communicate with a parent, guardian, or counsel prior to interrogation. Rule 11(A), Alabama Rules of Juvenile Procedure provides:
"When the child is taken into custody, he must be informed of the following rights by the person taking him into custody:
"(1) that he has the right to counsel;
"(2) that if he is unable to pay a lawyer and that if his parents or guardian have not provided a lawyer, one can be provided at no charge;
"(3) that he is not required to say anything and that anything he says may be used against him; and
"(4) if his counsel, parent, or guardian is not present, that he has a right to communicate with them, and that, if necessary, reasonable means will be provided for him to do so."
"Rule 11(A)(1), (2), and (3) taken together, are substantially the same as the warnings required in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). By virtue of Rule 11(A)(4), this Court included an additional warning for the protection of juveniles." Ex parte Whisenant, 466 So.2d 1006, 1007 (Ala.1985). "In reality, each of the four requisites stands on the same footing. To omit the fourth warning is as fatal as to omit of [sic] any one of the first three." Id. "If any one or more of these warnings are omitted, the use in evidence of any statement given by the child is constitutionally proscribed." Id. Although there is no indication in the *69 record that the appellant was advised of this right, as required under the State's burden of proof, the error is harmless in the present case. It has previously been established that the principles of harmless error "pertain to voluntary, albeit `illegally obtained' statements, i.e., those whose illegality follows from a failure to give adequate Miranda warnings or from other improper police procedures, see, e.g. Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972)." Neelley v. State, 494 So.2d 669, 674 (Ala.Cr.App.1985), affirmed, 494 So.2d 697 (Ala.1986). "`The two standards employed by the courts to determine whether a trial error is harmless are the "overwhelming evidence" test and the "harmless beyond a reasonable doubt" test.'" Id.
Any error in the admission of the appellant's statement to Sergeant White was rendered harmless when the appellant admitted to the same facts on the witness stand. Warden v. State, 468 So.2d 203, 205 (Ala.Cr.App.1985), citing Romine v. State, 384 So.2d 1185, 1188 (Ala.Cr.App.), cert. denied, Ex parte Romine, 384 So.2d 1188 (Ala.1980); Neelley v. State, supra.
In Payne v. State, 487 So.2d 256 (Ala.Cr. App.1986), a juvenile defendant was never informed of his right to communicate with a parent after he was taken into custody. However, the court found that "[a]ll the essential elements and facts contained in Payne's statement were proven by other testimony and were virtually undisputed. Consequently, the error in the admission of his statement was harmless." Payne v. State, supra, at 259, citing Romine v. State, supra; Kelley v. State, 366 So.2d 1145, 1150 (Ala.Cr.App.1979).

IX.
The appellant claims that reversible error occurred when he, a juvenile who was charged with a non-capital offense in juvenile court, was transferred to circuit court and indicted for a capital offense. Although the appellant's argument as to this issue is vague concerning the framework for analyzing his deprivation of rights, we will consider whether the transfer was error on the grounds that the circuit court failed to have jurisdiction over the juvenile for the offenses charged and whether the change in the offense charged, after the transfer, resulted in a deprivation of due process for failure to adequately notify the appellant of the charges raised against him. The appellant argues that at juvenile court he was charged with the crime of intentional murder; however, at circuit court he was indicted and convicted of capital murder. "A waiver, in a general sense, is the voluntary and intentional abandonment, renunciation, or relinquishment of a known legal right.... `To waive, is to give up, to abandon and relinquish. It leaves the thing abandoned as though it had never been.'" Caulfield v. Finnegan, 114 Ala. 39, 21 So. 484, (1896). A waiver implies abandonment and not reservation for future use. Panoualias v. National Equipment Co., 269 F. 630, 632 (2d Cir.1920).
"In a juvenile waiver or transfer proceeding, the family or juvenile court elects whether to retain its jurisdiction over a juvenile accused of certain crimes under certain circumstances, or to transfer him to a criminal court for trial." Juvenile Transfer Proceedings, 5 J.Juv.L. 81 (1981).
"[I]t is common to provide that if the juvenile has reached a specified age, one lower than the age at which juvenile court jurisdiction terminates, there is `concurrent' jurisdiction with the court of general criminal trial jurisdiction. `Concurrent' in this setting in fact means `alternative,' in the sense that there cannot be an adjudication of delinquency and a conviction of crime for the same act. The choice of alternatives is almost always made by the juvenile court and not by the court of criminal jurisdiction. A minor under the maximum age for juvenile court jurisdiction must first be processed in juvenile court. At the request of the prosecutor, or occasionally at the instance of the juvenile court judge himself, the case may be waived to the adult criminal court [see, in general, Paulsen, Kent v. United States: The Constitutional Context of Juvenile Cases, 1966 Supreme Court Review 167; Rubin & *70 Shaffer, Constitutional Protections for the Juvenile, 44 Denver L.J. 66, 75, 82 (1967); Comment, 40 So.Calif.L.Rev. 158 (1967)]."
George, Gault and the Juvenile Court Revolution (1968) at 25-26.
"In order to `transfer' or `waive' juvenile court jurisdiction, certain criteria have to be met. Such factors as age, nature of the crime, and prior record are examples." National District Attorneys Association, Juvenile Law and Procedure (1973) at p. 10. "The waiver of juvenile court jurisdiction to a court of general criminal jurisdiction is usually for acts which would constitute a felony if committed by an adult." National District Attorneys Association, Juvenile Law and Procedure (1973) at 10. See also Code of Alabama (1975), § 12-15-34(a)(1).
Furthermore, in determining whether the circuit court has jurisdiction over a juvenile who was charged with a non-capital offense in juvenile court and, subsequently, with a capital offense in circuit court, one of the purposes behind the transfer process becomes pertinent. "Theoretically, transfer laws screened out the hard-core juvenile felony offender, thereby allowing the juvenile justice system to concentrate on those who could be rehabilitated." A Model for the Transfer of Juvenile Felony Offenders to Adult Court Jurisdiction, 4 J.Juv.L. 170 (1980) at 179.
In the present case, the case action summary contains the following entry:
"The Court having reviewed the records and exhibits admitted in evidence, including the orders of this Court and the Talladega County Court, finds that said child has been referred to the Talladega County Juvenile Court on more than seven (7) occasions; he has been committed to Alabama Department of Youth Services on one (1) occasion; and the Court having considered the relevant factors contained in Section 12-15-34, Code of Alabama, 1975, that said child is not committable to an institution or agency for the mentally retarded or mentally ill; that the best interest of the child and the public would be to grant the Motion to Transfer."
It is clear, that under the policy reasons supporting the transfer hearing, that the more heinous the crime, the more appropriate is the circuit court for adjudication thereof. Transference Proceedings, 7 J.Juv.L. 254 (1983) at 257; Commonwealth v. Moyer, 497 P.A. 643, 444 A.2d 101 (1982) A Model for the Transfer of Juvenile Felony Offenders to Adult Court Jurisdiction, supra, at 172; Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). Furthermore, "a transfer hearing is not for the determination of the guilt or innocence of the [appellant], but is in the nature of a preliminary hearing to determine whether there is probable cause `for believing that the allegations are true and correct.'" Winstead v. State, 371 So.2d 418, 420 (Ala.1979).
"It is well recognized that a transfer hearing is not a hearing to adjudicate the guilt or innocence of the child accused of a crime but is, instead, a probable cause hearing to determine whether the child should be transferred out of the juvenile court for criminal prosecution as an adult. See Kent, supra."
Brown v. State, 353 So.2d 1384, 1387-88 (Ala.1977). Moreover, "the State is required to determine whether it wants to treat a juvenile within the juvenile court system before entering upon a proceeding that may result in an adjudication that he has violated a criminal law." Boyd v. State, 341 So.2d 680, 683 (Ala.1976), citing Breed v. Jones, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975).
"In Breed v. Jones, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), the United States Supreme Court held that to subject a defendant to an adjudicatory proceeding whose object is to determine whether the juvenile has committed acts that violate a criminal law as distinguished from a proceeding limited to the question of transfer, and then, instead of sentencing, transfer him to an adult trial, amounts to double jeopardy. Breed does not preclude separate juvenile and adult proceedings but closely limits the issues which may be considered in the first proceeding. *71 If the juvenile court determines that the juvenile has actually violated a criminal law, adjudges the juvenile delinquent and unfit for treatment as a juvenile and transfers him to the Circuit Court for treatment as an adult offender, jeopardy has attached under the doctrine announced in Breed, and the juvenile would be placed in double jeopardy by trial in the Circuit Court. The juvenile court is only authorized to make a finding of probable cause concerning the specific act leading to the delinquency petition before transferring the juvenile for trial in Circuit Court. Boyd v. State, Ala., 341 So.2d 680 (1977). See also Government of Virgin Islands v. Smith, 558 F.2d 691 (3 Cir.1977)."
Smith v. State, 368 So.2d 298, 301 (Ala.Cr. App.1978), writ quashed, 368 So.2d 305 (Ala.1979). (Emphasis added.) Thus, at a transfer hearing, the juvenile court is limited to determine whether probable cause exists concerning specific acts and not whether the juvenile committed a criminal offense. On the other hand, the circuit court to which the cause is transferred may be limited to the consideration of the specific acts, behavior, or subject matter of the offense, but it is not limited to a specific named offense, as the juvenile court has not yet determined whether the juvenile committed a violation of a criminal law. Cf. State v. Knighton, 21 Ala.App. 330, 108 So. 85 (1926) ("when the grand jury is so empaneled and sworn, it becomes the supreme inquisitorial body of the county, and no preliminary act of any court or judge can limit its powers"; the jurisdiction of the circuit court was not interfered with by pendency of preliminary proceedings in the county court concerning the crime charged).
It is clear that under the due process clause, the juvenile is entitled to notice of charges, both for the juvenile court hearing and the subsequent trial. The notice for the juvenile hearing "must be in writing and must contain the specific charge or allegations of fact on which the proceeding is to be based.... The test for the adequacy of the notice of charges is the same as in civil and criminal proceedings." Gault and the Juvenile Court Revolution, supra, at 33. In the present case, the record indicates that the appellant was initially arrested for murder, robbery, and kidnapping. The record also shows that during the transfer hearing, sworn testimony was delivered in court by the victim's father and by Charles Leonard, Sergeant Eddie White, Deputy Terry Ratigan, the attending physician, and several other witnesses. Although the testimony given by these witnesses at the hearing is not included in the record, the subject matter of their testimony surely addressed the incident at hand.
"It is clear that the appellant and his trial counsel had knowledge that the appellant's case had been transferred. Additionally, the transfer ordered by the juvenile court was a part of the circuit court clerk's file, and the appellant had notice of that fact. Therefore, the circuit court had jurisdiction over the appellant and the subject matter of his case. See Carpenter v. State, Ala., 378 So.2d 730; Winstead v. State, Ala., 371 So.2d 418; Allums v. State, Ala.Cr.App., 368 So.2d 313; Smith v. State, Ala.Cr. App., 368 So.2d 298."
McMorris v. State, 394 So.2d 392, 397 (Ala. Cr.App.1980). (Emphasis added.)
The appellant cites Williamson v. State, 242 Ala. 42, 4 So.2d 734 (1941), to support his argument; however that case is easily distinguishable from the case at bar in that in Williams the case was transferred from circuit court to juvenile court and the charges which were raised in circuit court were withdrawn by the affiant. Further, there was no order of transfer, as required by statute, appearing in the record in Williamson.
For the foregoing reasons, the judgment of the trial court is hereby affirmed.
AFFIRMED.
TAYLOR and TYSON, JJ., concur.
BOWEN, P.J., and PATTERSON, J., concur in result only.

*72 ON APPLICATION FOR REHEARING
McMILLAN, Judge.
On rehearing, the defense counsel argues that although he did not at the time of the charge object to the omission of charges on the lesser included offenses of robbery and kidnapping, he did so object at the charge conference which was held immediately prior to summation. However, even if this issue was preserved for review, we agree with the trial court's ruling that, under the facts of this case, including the defendant's own testimony, a charge on a lesser included offense should not have been given, because there was no reasonable theory from the evidence to support a finding of a lesser offense. Perry v. State, 455 So.2d 999, 1002 (Ala.Cr.App.1984); Daly v. State, 442 So.2d 143 (Ala.Cr.App. 1983); Phelps v. State, 435 So.2d 158 (Ala. Cr.App.1983); Gwin v. State, 425 So.2d 500 (Ala.Cr.App.1982), writ quashed, 425 So.2d 510 (Ala.1983). "Furthermore, a trial judge may properly refuse to charge on a lesser included offense when it is clear to the judicial mind that there is no evidence to support the jury's being charged on the lesser included offense. Wesley v. State, 424 So.2d 648 (Ala.Cr.App.1982); Chavers v. State, 361 So.2d 1106 (Ala.1978)." Greer v. State, 475 So.2d 885, 890 (Ala.Cr.App. 1985). "The evidence presented demonstrated the completed crime, and nothing short thereof." Hollins v. State, 415 So.2d 1249, 1253 (Ala.Cr.App.1982).
Furthermore, first degree kidnapping is not a lesser included offense of the crime charged, that is, the capital offense of murder during a robbery in the first degree. As to the lesser charge of first degree robbery, it is clear from the facts of this case, including the appellant's version of the facts, that the appellant is at least guilty of felony murder. The appellant testified to the facts of the robbery and his involvement therein and further admitted that there was a killing in the course of and in furtherance of the robbery. Under these facts, the appellant is at least guilty of felony murder. See § 13A-6-2(a)(3), Code of Alabama (1975).
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All the Judges concur.