904 So.2d 331 (2003)
Levi PACE
v.
STATE of Alabama.
CR-01-1249.
Court of Criminal Appeals of Alabama.
April 25, 2003.
On Return to Remand April 30, 2004.
Rehearing Denied June 18, 2004.
Certiorari Denied January 14, 2005.
*334 Wilson Myers, Sr., Gulf Shores; and Christopher Wayne Adams, Atlanta, Georgia, for appellant.
William H. Pryor, Jr., atty. gen., and John M. Porter, asst. atty. gen., for appellee.
Alabama Supreme Court 1031519.
WISE, Judge.
The appellant, Levi Pace, was indicted for murder made capital because it was committed during a robbery in the first-degree.[1] See § 13A-5-40(a)(2), Ala.Code 1975. He was convicted of the lesser-included offense of murder, a violation of § 13A-6-2, Ala.Code 1975, and was sentenced to life imprisonment. The circuit court ordered that Pace's sentence was to run consecutively with sentences he was serving as a result of other convictions.
On March 12, 2002, Pace filed a motion for a new trial. That same day, Pace also filed a notice of appeal to this Court. The circuit court did not rule on Pace's new-trial motion; instead, the court *335 allowed the motion to be denied by operation of law.[2]
In his motion for a new trial, Pace raises numerous allegations of error. Of particular concern are Pace's following contentions regarding potential juror misconduct:
"10. Furthermore, during the sequestration, Mr. Pace was prejudiced by the juror's access to improper information and misconduct. For instance, while sequestered [juror J.B.] was allowed to call a friend, and the friend told her about a newspaper article on the case. The friend told [juror J.B.] that the article said Mr. Pace had been previously convicted for the crime for which he was on trial, and the conviction was reversed due to an issue involving race and the grand jury. See affidavit of Investigator Kate Weisburd. Further, after learning this from her friend, [juror J.B.] sought to confirm the information and asked the bailiff whether Mr. Pace had previously been tried and convicted for this offense. The bailiff told her that the bailiff could not answer but instructed her to ask the other jurors if this was Mr. Pace's second trial and if the first had been reversed. [Juror J.B.] heeded this instruction, and her other jurors confirmed that Mr. Pace had been previously convicted. This answer by the bailiff is prejudicial as it encourages [juror J.B.] to seek improper information from other jurors.
"11. Mr. Pace was denied a fair trial due to the juror misconduct of [juror O.F.]. [Juror O.F.], and all the jurors, was voir dired about whether his racial attitudes would influence him in reaching a verdict in the case, and he denied having any racial views that would impact his ability to be a fair and impartial juror. After defense witnesses Oliver and Clyde Cook, African-American men, testified, [juror O.F.] told other jurors that he does not believe a `word those niggers said.' See attached statement of alternate juror [J.M.], page 4. The implication is that he would have believed the witnesses if they were white. This is improper and premature deliberation. Additionally, it is clear that [juror O.F.] harbors racist views and was not honest in voir dire about his racial views. Had [juror O.F.] been honest in voir dire, he would have been stricken for cause or stricken by the defense. This dishonesty prejudiced Mr. Pace's case as Mr. Pace is entitled to a jury free of concealed racial bias and a verdict free from racism."
(C. 1346-47.)
In support of his motion for a new trial, and as an addendum to that motion, Pace submitted the March 10, 2002, statement of alternate juror J.M., and an affidavit from Kate Weisburd, the investigator who interviewed juror J.B. concerning her telephone conversation with her friend and her subsequent conversation with the bailiff assigned to supervise the sequestered jury.
The State did not refute any of the allegations in Pace's motion for a new trial and supporting documents. The motion was denied by operation of law, without any ruling by the circuit court.
In Edgar v. State, 646 So.2d 683, 687 (Ala.1994), the Alabama Supreme Court addressed a similar situation:

*336 "We hold that where, as here, a criminal defendant's motion for a new trial is denied under the provisions of Rule 24.4, Ala.R.Crim.P., without an affirmative statement by the trial judge giving the ruling a presumption of correctness and the defendant supports his new trial motion by evidence that was not presented at trial, and that evidence, if not controverted by the State, will entitle him to a new trial, the denial by operation of law should be reversed and the case remanded for the trial court to conduct a hearing on his motion for new trial and then enter an order either granting or denying the motion."
See also Benjamin v. State, 889 So.2d 610, 612 (Ala.Crim.App.2003); McDade v. State, 864 So.2d 377, 378 (Ala.Crim.App.2002).
While we express no opinion as to the merits of Pace's other grounds in his motion for a new trial, we note that the two allegations set out above cause this Court grave concern. Indeed, this Court has previously determined that a juror's failure to respond truthfully to questions during voir dire warranted a new trial. See, e.g., Tomlin v. State, 695 So.2d 157, 175-76 (Ala.Crim.App.1996); State v. Freeman, 605 So.2d 1258, 1259-60 (Ala.Crim.App.1992). Moreover, "[j]uror misconduct will justify a new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law." Whitten v. Allstate Ins. Co., 447 So.2d 655, 658 (Ala.1984). Although in a different context, the Supreme Court recently noted: "`"[W]e are hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged."'" Ex parte Pettibone, 891 So.2d 278, 279 (Ala.2003) (quoting Frazier v. State, 632 So.2d 1002, 1007 (Ala.Crim.App.1993) (quoting in turn United States v. Attell, 655 F.2d 703, 705 (5th Cir.1981))).
Based on Edgar, we remand this case for the circuit court to make specific, written findings of fact as to each claim Pace raised in his motion for a new trial. On remand, the circuit court should require the State to respond to the motion and should conduct a hearing on the motion. If the circuit court determines that Pace is entitled to relief on his claims, then the court may grant such relief as it deems appropriate.
The circuit court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 56 days of the release of this opinion. The return to remand shall include the State's response, a transcript of the proceedings on remand, and the circuit court's specific written findings of fact.
REMANDED WITH DIRECTIONS.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.

On Return to Remand
WISE, Judge.
Levi Pace was convicted of murder, a violation of § 13A-6-2, Ala.Code 1975. He was sentenced to life imprisonment.
Pace was originally indicted for capital murder on July 2, 1992, for shooting and killing Jerry Hargrove, the desk clerk at the Days Inn motel in Decatur, during a robbery in December 1991. (C. 29-30.) He was found guilty and sentenced to death. That conviction was overturned by this Court. Pace v. State, 714 So.2d 320 (Ala.Crim.App.1996), rev'd in part and remanded, 714 So.2d 332 (Ala.1997), opinion on remand, 714 So.2d 340 (Ala.Crim.App.1998). On July 28, 1998, Pace was re-indicted for capital murder, a violation of *337 § 13A-5-40(a)(2), Ala.Code 1975 (murder made by capital because it was committed during a robbery); he was convicted of the lesser-included offense of felony murder on February 16, 2002. The trial court sentenced Pace to life imprisonment, that sentence to be served concurrently with other sentences Pace was serving in unrelated cases. (R. 2590-91.) Pace appealed, and we remanded this cause to the trial court with directions that it address Pace's motion for a new trial. Pace v. State, 904 So.2d 331 (Ala.Crim.App.2003). The trial court entered an order on September 15, 2003, denying Pace's motion for a new trial. This cause is now before us on the merits of Pace's arguments asserted in his brief on appeal.

I.
Pace raises three arguments relative to alleged juror misconduct or bias: (A) He contends that the trial court erred when it failed to strike for cause prospective juror J.D., based upon J.D.'s knowledge of the case garnered before trial from newspaper articles; (B) he argues that juror O.F. was racially biased, which denied him a fair trial; and (C) he contends that juror J.B. impermissibly obtained information from an outside source, which also denied him a fair trial.
Because Pace was charged with capital murder, the trial court went through extensive efforts to qualify the jury panel. The voir dire process, which lasted more than three days, represents over 1,000 pages in the record. (C. 12; R. 466-1486, 1516-36.) The jury panel was initially composed of about 90 persons. After the initial questioning by the trial court, the jury panel was pared down to about 65 persons, who were then divided into 5 panels. The first three panels were voir dired by the trial court and the attorneys, and after several veniremembers were removed for cause, the pool of jurors was reduced to 36 persons. Each side was granted 12 peremptory strikes, with the last two strikes being alternates. (C. 1301-02, 1304-05; R. 470, 479, 520, 523, 526-28, 567, 807, 1111, 1525, 1527.) Jurors J.D. and O.F. were on panel one; juror J.B. was on panel two. Pace used one of his peremptory strikes to remove juror J.D., but jurors O.F. and J.B. were not struck by either side; they both served on the jury. (C. 1301-02; R. 525, 527, 1533.)
We recently addressed similar issues in DeBruce v. State, 890 So.2d 1068, 1077-78 (Ala.Crim.App.2003), in which we stated:
"When evaluating a juror-misconduct claim we apply the standard articulated by the Alabama Supreme Court in Ex parte Dobyne, [805 So.2d 763 (Ala.2001)]. The Supreme Court stated:
"`It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely. See Fabianke v. Weaver, 527 So.2d 1253 (Ala.1988). However, not every failure to respond properly to questions propounded during voir dire "automatically entitles [the defendant] to a new trial or reversal of the cause on appeal." Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330, 335 (1970); see also Dawson v. State, [710 So.2d 472] at 474 [(Ala.1997)]; and Reed v. State, [547 So.2d 596 (Ala.1989)]. As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is "whether the defendant might have been prejudiced by a veniremember's failure to make a proper response." Ex parte Stewart, 659 So.2d [122] at 124 [ (Ala.1993) ]. Further, the determination of whether *338 a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court's discretion.'
"805 So.2d at 771-72 (footnote omitted).
"....
"`The test for determining whether juror misconduct is prejudicial to the defendant and, thus, warrants a new trial is whether the misconduct might have unlawfully influenced the verdict rendered. Ex parte Troha, 462 So.2d 953, 954 (Ala.1984); Roan [v. State] 225 Ala. 428, 435, 143 So. 454, 460 (1932); Leith [v. State] 206 Ala. 439, 90 So. 687, 690 (1921). Once the trial court investigates the misconduct and finds, based on competent evidence, the alleged prejudice to be lacking, this Court will not reverse. See Bascom v. State, 344 So.2d 218, 222 (Ala.Crim.App.1977).'
"[Reed v. State, 547 So.2d 596, 597 (Ala.1989).] Moreover, `"[we] grant great deference to the trial judge, who is on the scene and who can best judge the credibility of the participants and determine what actually occurred." Ex parte Pressley, 770 So.2d 143, 147 (Ala.2000).' Dobyne, 805 So.2d at 772...."

A.
Pace contends that the trial court should have removed juror J.D. for cause because, Pace argues, J.D. was biased by pretrial media coverage. During the questioning of panel one, J.D. indicated that he had recently read two newspaper articles about the case. J.D. was later called for individual questioning by the trial court, at which time the following occurred:
"[DEFENSE COUNSEL]: [J.D.], we asked that you be brought back because you had remembered something about this case or saw it in the paper....
"JUROR [J.D.]: Yeah. Well, I read yesterday's Decatur paper and it was in there. Then there was something about it in this morning's Birmingham paper. I subscribe to both of them.
"[DEFENSE COUNSEL]: What do you remember about the articles?
"....
"JUROR [J.D.]: The Birmingham paper there really wasn't anything other than he was going to be retried for the crime that was committed. I don't even believe the Birmingham paper mentioned about Chilton County [an unrelated case]. Now, the Decatur paper did. It went into that about the  something about a restaurant or hotel or something and said people were put in a freezer or locker room or something to that effect. And, of course, it talked about the Days Inn [the crime for which he was on trial].
"....
"[DEFENSE COUNSEL]: ... I kind of wonder how you feel about reading about these articles in the paper might influence you as you come in here?
"JUROR [J.D.]: Reading the Decatur Daily, I don't put a whole lot of stock in the Decatur Daily. ... I don't think it would influence me, no. And I guess I probably know some more facts than some of the people that didn't read yesterday's paper.
"[DEFENSE COUNSEL]: How about the fact that he's been on trial before? Did the articles mention what the result of that trial was?
"JUROR [J.D.]: The Decatur paper did, yes.
"[DEFENSE COUNSEL]: And I assume it mentioned that he was convicted?

*339 "JUROR [J.D.]: Convicted and sentenced to death.
"[DEFENSE COUNSEL]: How does that influence you knowing that he's been on death row for what we may ask you to try to rejudge?
"JUROR [J.D.]: How does that affect me? I guess maybe it could taint me a little bit. Still, you know, burden of proof there that has to be done. But like I said, I did know coming in that he had been on death row.
"[DEFENSE COUNSEL]: ... I wondered if [because] you read these articles if you feel like you might be better used on another case that you hadn't read about, that you really feel like somewhere down the road you may be tainted by what you've already read?
"JUROR [J.D.]: Possibly, yeah. Maybe. I mean, I can't say for sure. Like I said, I'm willing to hear the evidence and go from there.
"[DEFENSE COUNSEL]: Let me make sure. I think I'm hearing you say... that you would try your best to go by what you hear in the courtroom but you're not positive that  as much as you'll try to do that you can't promise us that at the end of this case these articles won't influence how you viewed the case in some way?
"JUROR [J.D.]: You're probably right. I probably would be because of the articles. I know he's already been convicted and there's nothing I can do about that.
"....
"[PROSECUTOR]: ... [D]o you believe if there's something inconsistent about what you saw in the paper if you were selected to serve on this jury and if there was something inconsistent about what you read in the paper, inconsistent with the evidence you heard, that you [could] decide the case based on the evidence rather than what you read in the newspaper?
"JUROR [J.D.]: Yes, sir. I do not trust the Decatur Daily.

"[PROSECUTOR]: You say you do not trust the paper that you read this article in?
"JUROR [J.D.]: No, not at all.
"[PROSECUTOR]: That's where you gleaned all this information basically that you told us about?
"JUROR [J.D.]: Right. Nothing in the Birmingham paper.
"[PROSECUTOR]: ... Would you hold the State of Alabama and my side of the courtroom ... to the test of the burden of proof? As the Judge tells you, we [have] to prove the defendant guilty beyond a reasonable doubt and if we failed to do that would you have a problem returning a verdict of not guilty?
"JUROR [J.D.]: No, I wouldn't.
"[PROSECUTOR]: Regardless of what you read, heard or anything else?
"JUROR [J.D.]: No, if you couldn't prove it.
"[PROSECUTOR]: We just lose?
"JUROR [J.D.]: Right.
"[PROSECUTOR]: Or he's found not guilty?
"JUROR [J.D.]: Right.
"....
"THE COURT: Do you understand that [Pace] is now before you standing innocent?
"JUROR [J.D.]: Right.
"THE COURT: Regardless of what he did at this point legally he is 
"JUROR [J.D.]: He's innocent.
"THE COURT: He's not guilty of any crime?
"JUROR [J.D.]: Right.

*340 "THE COURT: And you understand that?
"JUROR [J.D.]: Right.
"THE COURT: You seem to. Not trusting the Decatur Daily, are you telling me that you can't put that out of your mind and try this case based on the facts you hear over 
"JUROR [J.D.]: Well, look, I don't trust the Decatur Daily. I think I could. I think I could listen to the evidence and the defense and I think I could render a verdict."
(R. 737-46.)
Pace requested that juror J.D. be struck for cause. The trial court commented that J.D. was "pretty straightforward" and indicated that he could try the case "based on the evidence and by the instructions from the Court." The trial court denied Pace's request to strike juror J.D. for cause. (R. 791-92, 1479-80.)
Section 12-16-150(7), Ala.Code 1975, states that a juror is subject to being struck for cause if "he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict."
"To justify a challenge for cause, there must be a proper statutory ground or `"some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court."' Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992)(quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.1983)). This Court has held that `once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions' about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror `need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.' Kinder v. State, 515 So.2d 55, 61 (Ala.Cr.App.1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror `"must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused"'; `"[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render."' Oryang v. State, 642 So.2d 979, 987 (Ala.Cr.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Cr.App.1989))."
Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998).
"`"The test to be applied is can the juror eliminate the influence of his scruples and render a verdict according to the evidence. Ordinarily a juror is not disqualified where it appears that he is willing to follow the instructions of law given by the trial court and is able to decide the case impartially according to the evidence notwithstanding his scruples. The determination of this question is based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Tidmore [v. City of Birmingham, 356 So.2d 231 (Ala.Cr.App.1977), cert. denied, 356 So.2d 234 (Ala.1978)]. A juror is incompetent whose answers show that he would follow his own views regardless *341 of the instructions of the court. Watwood v. State, 389 So.2d 549, 550 (Ala.Cr.App.), cert. denied, 389 So.2d 552 (Ala.1980)."
"`Barbee v. State, 395 So.2d 1128, 1130-31 (Ala.Cr.App.1981)....
"`"Thus, where a juror states that he has opinions but that he would try the case fairly and impartially according to the law and the evidence and that he would not allow his opinion to influence his decision, it is not error for a trial judge to deny a challenge for cause. Howard v. State, 420 So.2d 828, 831 (Ala.Cr.App.1982). `A juror who brings his thoughts out into the open in response to voir dire questions may be the one who later "bends over backwards" to be fair....' Clark v. State, 443 So.2d 1287, 1289 (Ala.Cr.App.1983)."
"`Mahan v. State, 508 So.2d 1180 (Ala.Crim.App.1986).'
"Kinder v. State, 515 So.2d 55, 60-61 (Ala.Cr.App.1986)."
Harris v. State, 632 So.2d 503, 520-21 (Ala.Crim.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
Though juror J.D. indicated that he had read about the case in the newspaper, he assured the trial court that he could set aside what he had read and follow the instructions of the trial court. Therefore, the trial court did not err by refusing to remove juror J.D. for cause. Moreover, the Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike. Bethea v. Springhill Mem'l Hosp., 833 So.2d 1 (Ala.2002).

B.
Pace also contends that juror O.F., who is white, was racially biased because, Pace contends, O.F. made a racial comment while the jury was sequestered that indicated he would not believe two defense witnesses, who were black. Pace claims that O.F. failed to disclose his racial bias during voir dire and that this failure denied him a fair trial.
During its voir dire of panel one, Pace's trial counsel asked the prospective jurors if "anybody here [has] any feelings or thoughts that we need to discuss concerning this case because the victim is white and Mr. Pace is black?" No one responded. (R. 683.)
During trial, Pace called four witness to testify. Two of those witnesses, Oliver Cook and Clyde Cook, were called to attempt to impugn the reputation and veracity of the State's key witness, Linda Jones. Linda Jones testified that she was present when Pace shot and killed the victim in this cause. See Part III of this opinion. According to Pace, Oliver Cook and Clyde Cook "were the only two African-American witnesses testifying in the trial other than Linda Jones, the accomplice."[1] (See principal brief of appellant at 27.) Between Oliver and Clyde Cook, they testified that they had known Linda Jones since they were children, that she was an untruthful person, that she was a drug addict and had participated in robberies to support her drug addiction, that she sold illegal drugs, that she had previously shot at Clyde Cook and at her father, and that she had recently stabbed a man who was living with her. (R. 2323-28, 2332-37.) Oliver Cook testified that Linda Jones told *342 him that she was the one who shot and killed the victim, and that she was "going to put it on" Pace. (R. 2334-35.)
In support of his posttrial motion, Pace attached a handwritten statement of J.M., an alternate on the jury, prepared by an investigator hired by Pace's defense counsel. (C. 1345, 1350.) In the statement, J.M. stated: "The night after the two inmate witnesses testified, [another juror], [O.F.] and I spoke in our suite. [O.F.] said, `I don't believe a word those niggers said.'" (C. 1353.) According to the statement, O.F. commented the day after making the racial slur that he did not think the voting would take long and that J.M. believed O.F. had made up his mind regarding Pace's guilt. (C. 1353-54.)
On remand, the trial court conducted a hearing on Pace's motion for a new trial, at which this issue was addressed. In its order denying Pace's motion, the trial court wrote:
"In paragraph numbered 11 [of his motion], the appellant, Levi Pace, through his attorney, alleges that he was denied a fair trial due to juror misconduct or due to the misconduct of [O.F.]. The appellant alleges that [O.F.] denied having any racial views that would impact the ability to be a fair and impartial juror and further alleged that Mr. [O.F.] told other jurors after the testimony of two African-American men that he would not believe [a] `word those niggers said.' As [a] basis for this statement, the appellant offered the affidavit and testimony of [J.M.], who served as an alternate juror in this case.... The Court also heard testimony from [O.F.] who denied ever using the word `nigger' during the course of the trial and further denied having any racial prejudice or any racial views that impacted his ability to be fair and impartial as a juror.... [J.M.] testified that he disagrees with the jury's verdict. The Court observed both [J.M.] and [O.F.] and finds the testimony of ... [O.F.] to be credible, more sincere and more believable than that of the testimony of [J.M.]. There is no basis to support a finding that [O.F.] is racially prejudiced or that his verdict was racially motivated."
The trial court, having viewed the two jurors and heard the testimony, was in a much better position to determine whether the alleged racial statement was made by Juror O.F. and, if made, whether Pace was denied a fair trial as a result. As a result, we will not overturn the trial court's findings in this regard. See Perry v. State, 455 So.2d 999, 1003 (Ala.Crim.App.1984), in which we noted that an abuse-of-discretion standard applies to a trial court's ruling on a new-trial motion and stated: "Assessing the credibility of evidence presented at a new trial hearing falls to the trial judge because he is in the best position to evaluate the new evidence in light of all that has gone before."
We also note that the trial court's order is supported by the record. As noted, the alleged racial statement by O.F. was made the night after Clyde Cook and Oliver Cook testified and the alleged statement that O.F. had already made up his mind occurred a day later. The record reveals that the last full day of trial was on February 15, 2002, and that the jury was reconvened at 9:07 a.m. (R. 2316.) Pace called Clyde Cook and Oliver Cook to testify as his first witnesses that morning. (R. 2323, 2331.) Pace then called two other witnesses to testify, and the defense rested. The trial court dismissed the jury for the lunch break at 10:47 a.m. (R. 2383, 2386.) The trial court then conducted a charge conference, and the jury was reconvened at 1:34 p.m. (R. 2434.) That afternoon consisted of closing arguments and the *343 trial court's final charge to the jury. At the conclusion of the court's charge, the alternate jurors, including J.M., were relieved of their duties and permitted to return home. The trial court directed the bailiffs that J.M. and the other excused juror were to have no further contact with the other jurors. (R. 2574-78.) After selecting their foreperson, the remaining jurors elected to come back the next day, February 16, 2002, to complete their deliberations and render their verdict. (R. 2580-81.) Therefore, J.M. was not even with O.F. on the night or the day after Clyde Cook and Oliver Cook testified. These statements, if they occurred at all, could not have occurred when J.M. claimed in his statement that they did.
Even had Pace been able to establish that O.F. was prejudiced against blacks, Pace would not have been denied a fair trial. The testimony of Clyde Cook and Oliver Cook, to the extent it was elicited to discredit Jones, likely had little impact on the jury, because Jones, who was black herself, conceded during her testimony that she had served time in prison for a murder that occurred in 1985; that she eluded arrest and was charged with escape after the police tried to arrest her for the 1991 robberies; that she had lied to benefit herself on past occasions; that she struck a deal with the police in exchange for her testimony against Pace in this case, receiving a 10-year sentence as opposed to a possible sentence of death or life imprisonment; that she participated in both crimes at the Days Inn motel in Decatur in 1991; that she was armed with a handgun in December 1991 when Hargrove, the victim in this case, was killed; that she had been a crack cocaine addict and a prostitute; that she relied upon men to supply her drug habits; that she committed other crimes to support her drug addiction; that she still smoked marijuana; that she had recently had money seized from her home in a drug forfeiture; and that her prior testimony against Pace differed in numerous respects from her testimony at trial. (R. 1760, 1778-95, 1803-15, 1820-25, 1838-42, 1853, 1858-60, 1872-98, 1912-16.) Jones's testimony was far more damaging to her own credibility than the testimony of Oliver Cook and Clyde Cook was, so O.F.'s refusal to consider the Cooks' testimony would have been harmless.

C.
Pace next argues that juror J.B. obtained information from an outside source relative to the case while the jury was sequestered, which Pace claims prejudiced him and denied him a fair trial. In support of his claim, Pace attached to his motion for a new trial an affidavit from Kate R. Weisburd, an employee of the Southern Center for Human Rights in Georgia. (C. 1345, 1357.) In her affidavit, Weisburd states:
"6. On March 2, 2002 I interviewed [J.B.], a juror that served on the February 2002 Levi Pace trial in Morgan County, Alabama....
"7. [J.B.] informed me that during the trial, and before deliberations, she spoke to a friend on the phone. During this conversation, the friend mentioned an article in the paper about Mr. Pace's first trial. The friend mentioned that a previous conviction had been overturned because of an issue that dealt with race and the composition of the grand jury.
"8. [J.B.] also informed me that during the trial, and before deliberations, she asked a Bailiff if this was indeed Mr. Pace's first or second trial. [J.B.] said that the Bailiff told her that they could not answer that question and instructed her to ask the other jurors if this was Mr. Pace's first or second trial.

*344 "9. [J.B.] informed me that on the instruction of the Bailiff, she asked several other jurors if this trial was Mr. Pace's first or second trial. [J.B.] informed me that the group of jurors she asked all said that this was indeed Mr. Pace's second trial. [J.B.] indicated that this conversation took place before deliberations began."
On remand, the trial court addressed this issue. In its order, the court wrote:
"In paragraph numbered 10 of the appellant's motion for a new trial, attorneys for Mr. Pace argue that Mr. Pace was prejudiced by [a juror's] access to improper information and conduct. The motion alleges that [J.B.], a sequestered juror, was allowed to call a friend, [R.H.], who told her about newspaper articles being printed during the trial of the case and further alleged that [J.B.] learned that the defendant had been previously convicted for the crime for which he was on trial and that the conviction was reversed due to an issue involving race and the grand jury. Mr. Pace relies on the affidavit of one Kate Weisburd, who is an employee of an investigator for the Southern Center for Human Rights and Chris Adams, attorney for the appellant. [J.B.] testified on August 8, 2003 that [R.H.] was her neighbor but that during the trial of the case she had no knowledge of the prior conviction of Levi Pace, that [R.H.] never informed her, further that she never asked any bailiff about the prior conviction and that she never asked any jurors about the subject. It was not until after the case was over that she learned that Levi Pace had been previously convicted of this offense.
"On September 2, 2003 the Court conducted a second hearing on this matter and took testimony from the witness, [R.H., who had been a member of the jury venire but was struck]. [R.H.] stated that he was in fact friendly with [J.B.] or more specifically, [J.B.] was a friend to his wife. He further testified to the best of his memory he did not discuss the case with [J.B.]. He further stated that he did not talk to [J.B.] from the time he got released as a potential juror until the time the trial was over and that he did not have any conversation with [J.B.] while he was serving as a potential juror at the Morgan County Courthouse. He further stated that he knew well not to talk to others about any of the pending cases and that he did not conduct himself in any improper way.
"It is the Court's finding that the information contained in the affidavit of Katie Weisburd is unfounded and untrue and that neither [J.B.] nor any other juror was prejudiced by their access to improper information or involved in any misconduct during the course of the trial of Levi Pace."
Based upon the findings of the trial court, we conclude that Pace's argument is without merit. The trial court's denial of Pace's posttrial motion on this ground was not error.[2] See Perry, supra.

II.
Pace next argues that the trial court erred in sequestering the jury because, he contends, the jury was housed in a Holiday Inn motel across the street from *345 the Days Inn motel where the crime at issue occurred. Before trial, Pace requested that the jury not be sequestered at the Holiday Inn motel because, he argued, the Days Inn motel, where the offense occurred, could be seen from the Holiday Inn motel. (R. 1486-1501.) The trial judge responded that he was familiar with the Holiday Inn motel and the Days Inn motel, that it was very difficult to see the Days Inn motel from the Holiday Inn motel, that the sequestered jurors would be taken to and from their motel via a route away from the Days Inn motel, that the rooms reserved for the jurors were on the end of the Holiday Inn motel opposite the Days Inn motel, that the jurors would be precluded from being placed in a position which would allow them a view of the Days Inn motel, that the events in this case happened inside the Days Inn motel, that the Holiday Inn motel was the best place to house the jurors, that most of the jurors were likely familiar with the Days Inn motel, and that he would revisit the site to determine if there were any real risks in housing the jurors at the Holiday Inn motel. (R. 1492-96, 1499-1501.) Before the jurors were taken to the Holiday Inn motel, the trial court directed the bailiffs who would be accompanying them to take a route to and from the courthouse that would allow the jurors to avoid the Days Inn motel and to keep the jurors from any area of the Holiday Inn motel that would enable them to view the Days Inn motel. (R. 1572-74.)
Pace did not present evidence indicating that any juror gained extraneous information about the crime that prejudiced him by being housed at the Holiday Inn motel. Absent such a showing, Pace is not entitled to prevail on this claim. See, generally, DeBruce v. State, supra, in which we noted that the defendant failed to meet his burden of establishing that the jury was tainted or prejudiced.

III.
Lastly, Pace contends that the evidence was insufficient to sustain his conviction. He argues that the only evidence linking him directly to the attempted robbery and shooting of Hargrove in December 1991 was the uncorroborated testimony of Linda Jones. Pace further argues that Rule 404(b), Ala.R.Evid., evidence of collateral crimes is not "substantive evidence" and may not be considered as corroborative evidence to sustain a conviction.[3]
"A person commits the crime of [felony] murder if ... [h]e commits or attempts to commit ... robbery in any degree ... and, in the course of and in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person." § 13A-6-2(a)(3), Ala.Code 1975. "`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond *346 a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O'Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).
Section 12-21-222, Ala.Code 1975, states:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
In Arthur v. State, 711 So.2d 1031, 1059-60 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997), we wrote:
"`An accomplice's testimony must be supported by evidence connecting the defendant with the commission of the offense rather than merely showing that the offense occurred or the circumstances thereof. Code of Alabama 1975, 12-21-222; Miles v. State, 476 So.2d 1228 (Ala.Cr.App.1985); Jackson v. State, 451 So.2d 435 (Ala.Cr.App.1984).' Hodges v. State, 500 So.2d 1273, 1275 (Ala.Cr.App.1986).
"`"Corroboration need only be slight to suffice." Ingle v. State, 400 So.2d 938, 940 (Ala.Cr.App.1981). "While corroborating evidence need not be strong, it `... must be of substantive character, must be inconsistent with the innocence of a defendant and must do more than raise a suspicion of guilt.' McCoy v. State, 397 So.2d 577 (Ala.Crim.App.), cert. denied, 397 So.2d 589 (Ala.1981)." Booker v. State, 477 So.2d 1388, 1390 (Ala.Cr.App.1985). "However, the corroboration need not be sufficiently strong by itself to warrant a conviction." Miles v. State, 476 So.2d 1228, 1234 (Ala.Cr.App.1985). The requisite corroborative evidence is determined by a process of elimination or subtraction. Caldwell v. State, 418 So.2d 168, 170 (Ala.Cr.App.1981). "The means for analyzing the evidence to determine if there is sufficient evidence to corroborate testimony of an accomplice is to set aside the accomplice's testimony and determine whether or not the remaining evidence tends to connect the defendant with the commission of the offense." Leonard v. State, 459 So.2d 970, 971 (Ala.Cr.App.1984). "Whether such corroborative evidence exists is a question of law to be resolved by the trial court, its probative force and sufficiency being questions for the jury." Caldwell v. State, supra, at 170. Circumstantial evidence is sufficient to show corroboration. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App.1984). See also McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983).'
"Hodges v. State, 500 So.2d at 1275-76.
"In Ware v. State, 409 So.2d 886 (Ala.Cr.App.1981), writ quashed, 409 So.2d 893 (Ala.1982), this court quoted Andrews v. State, 370 So.2d 320, 322 (Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979), stating:
"`"The corroboration of an accomplice must tend to connect the accused *347 with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. `Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony.' Malachi v. State, 89 Ala. 134, 140-141, 8 So. 104, 106 (1889); Smith v. State, 230 Ala. 413, 416, 161 So. 538 (1935); Brown v. State, 31 Ala.App. 529, 19 So.2d 88 (1944). The corroborative evidence need not be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Bridges v. State, 52 Ala.App. 546, 295 So.2d 266 (1974); Dykes v. State, 30 Ala.App. 129, 1 So.2d 754 (1941). Corroborative evidence need not directly connect the accused with the offense but need only tend to do so. State v. Canada, 107 Ariz. 66, 481 P.2d 859, cert. denied, 404 U.S. 848, 92 S.Ct. 154, 30 L.Ed.2d 87 (1971). See Pearce v. State, 26 Ala.App. 492, 495, 164 So. 114, cert. denied, 231 Ala. 150, 164 So. 118 (1935)(`(B)ut, as we read the cases, the corroboratory evidence, if it meets the test of "tending to connect the defendant with the commission of the offense," need not be, in and of itself alone, that tending in any wise to fasten guilt upon the defendant'); 23 C.J.S. Criminal Law § 812(3) (1961). The sufficiency of corroborating evidence is established if its probative value tends to connect the defendant with the commission of the crime. Lowe v. State, 32 Ala.App. 176, 22 So.2d 618 (1945). The corroboration of an accomplice may be shown by circumstantial evidence. Blevins v. State, 56 Ala.App. 115, 319 So.2d 734, cert. denied, 294 Ala. 753, 319 So.2d 739 (1975); Tidwell v. State, 23 Ala.App. 409, 126 So. 186 (1930).
"`"In certain instances, association with the accomplice tending to show the accused's proximity, chronologically and geographically, to the alleged offense may furnish sufficient corroboration. Ross v. State, 74 Ala. 532 (1883); DeGraaf v. State, 34 Ala.App. 137, 37 So.2d 130 (1948)." 370 So.2d at 322.'
"409 So.2d at 891.
"Thus, to constitute sufficient corroboration, a fact or circumstance may tend to support the accomplice's version, thereby confirming his credibility, but in order to provide sufficient corroboration of accomplice testimony, the evidence must connect the accused with the commission of the offense. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App.1984)."
And in Ware v. State, 409 So.2d 886, 891 (Ala.Crim.App.1981) (quoting Jacks v. State, 364 So.2d 397, 405 (Ala.Crim.App.1978)), we observed:
"`Additionally, sufficient corroboration of the testimony of an accomplice may be furnished by a tacit admission by the accused, by the suspicious conduct of the accused, and the association of the accused with the accomplice, or by the defendant's proximity and opportunity to commit the crime.'"
The evidence at trial established that, between midnight and 1:00 a.m. on December 13, 1991, Jerry Hargrove, the desk clerk at the Days Inn motel in Decatur, Alabama, was shot and killed. The employees of CSX railroad frequented the Days Inn motel during their layovers in *348 Decatur. The last person known to have seen Hargrove alive, other than the murderer, and the individuals who found Hargrove's body were CSX employees. (R. 1612-14, 1632-33, 1749-50.) Pace was familiar with the Days Inn motel because he had been employed in the restaurant on the premises in 1989. (R. 1981.)
Linda Jones testified that on December 13, 1991, Pace picked her up near her home in Adamsville, and that she and Pace headed to Decatur "looking for something to rob." Jones testified that they drove by the Days Inn motel, circled it a couple of times, and saw a young man at the desk. She stated that Pace gave her a pistol and took a second pistol from the glove compartment of his car. Jones testified that she and Pace entered the motel at the back near the swimming pool, and that she went to the front desk under the pretext of registering for a room. She stated that, when she saw that no one else was in the lobby area except the desk clerk, she motioned for Pace "to come on" and that Pace approached the registration desk with a red bandana tied around his face. Jones testified that Pace then "drew down at the man" and said, "hey, you know what time it is." Jones claimed that Hargrove started running "for his gun," and that she panicked and started running as well.[4] Jones said that while she was running, she heard two shots but did not see who fired the shots. Jones testified that Pace then told her to "come on, let's go." She asked Pace if the desk clerk had fired his weapon, and Pace told her, "No, I fired both shots." Pace also told her that he knew the first shot he fired hit the victim and that he thought he killed him. (R. 1762-63, 1766-72, 1878-79, 1895, 1900.) Jones denied taking her weapon out of the pocket of the jacket she was wearing and stated that they did not take any money on this occasion. (R. 1772-73.)
Jones also testified that she and Pace had robbed the same Days Inn motel in Decatur in October 1991. She explained that the circumstances involving the first robbery of the Days Inn motel were very similar to the second robbery, in that both robberies were at night, that Jones and Pace "[c]ased it out" before entering, that they parked their vehicle in the same place, that they entered through the same door, that she went to the front desk to see if anyone else was in the lobby, that Pace approached the registration counter when she motioned for him, that Pace pointed the weapon at the female clerk, and that Pace told the female clerk, "hey, you know what time it is." Jones testified that the clerk got nervous and Pace jumped over the counter and took money from the cash drawer. Jones testified that Pace did not give her a weapon before this robbery and told her that if any shooting was necessary that she would not have to worry about it. (R. 1764, 1774-78.)
Jennifer Johnson testified that on October 20, 1991, she was employed as the front desk clerk at the Days Inn motel in Decatur, and that she was robbed by two people, whom she identified as Jones and Pace. Johnson testified that Pace pointed a revolver at her, jumped over the counter, cocked back the hammer on the gun, and demanded money. She testified that Pace told her, "don't mash any buttons or I will kill you." After taking the money, Pace ordered her to go into an adjoining office, put the gun to the back of her head, and told her, "don't turn on any lights, and don't call the police or I will kill you." Johnson testified that she did not see *349 Jones with a weapon. (R. 1927-28, 1935, 1945-46, 1949-56, 1969-70.) Pace pleaded guilty to the October 1991 robbery and was sentenced to 45 years' imprisonment. (R. 1977.)
Less than 48 hours after Hargrove was killed, Pace was involved in another motel robbery-shooting. Lois Blalock testified that she and her husband, Hershel, owned and operated the Alabama Lodge motel in Clanton. Lois Blalock testified that shortly after midnight on December 15, 1991, Pace and another male entered the motel and inquired about rooms, and Pace filled out a registration card. The fingerprints on the registration card were later identified as Pace's. (R. 2088-91.) When Lois Blalock looked up to see how Pace intended to pay for the room, Pace had a gun pointed at her face. Lois Blalock, who was sitting at a desk behind the registration counter, testified that she immediately slid down under the desk, but that Pace came around behind the registration counter and dragged her out. Lois Blalock testified that she was frightened and moaning loudly, and that Pace told her to be quiet or he would kill her. She stated that she was unable to quit moaning, and Pace shot her two times. Lois Blalock testified that Pace had her pinned to the floor by standing on her arms, that she continued to struggle with him, that she rammed her head into his crotch and that Pace stated, "[N]ow then I'm going to blow your head off." Hershel Blalock looked through a one-way mirror in the living area adjoining the hotel lobby and saw a man on top of his wife. Hershel grabbed his .22 rifle and opened the door leading into registration area, and Pace's accomplice fired three shots at him. Pace and his accomplice fled, but Pace paused, turned, and fired two more shots at Lois and Hershel Blalock, both of whom were lying on the floor. Lois Blalock was able to grab a pistol and fire her weapon several times at Pace and his accomplice as they fled. Lois Blalock was shot three times, in the wrist, buttock, and elbow; Hershel Blalock was shot twice, in the hip and back. (R. 2029-30, 2036-64, 2357-59, 2379-80.) Pace was tried, convicted, and sentenced to three consecutive life sentences for his role in the Clanton robbery-shooting. (R. 2120.)
Brent Wheeler of the Alabama Department of Forensic Sciences testified that he was provided with five bullets and nine shell casings, recovered from the Clanton and Decatur crime scenes. One of the bullets was removed from Hershel Blalock's hip. Wheeler identified the bullets and shell casings as being .380 caliber, and he concluded that all of the bullets were fired from the same gun and that all of the casings were ejected from the same gun. He testified that the bullets and the casings were probably fired from the same gun. (R. 2073, 2237-44, 2250, 2260-61, 2269-70, 2355.) The bullet that killed Hargrove was fired from a .380-caliber weapon. (R. 1648, 1667, 1689, 1751-52.)
The real issue is not whether the evidence supports the conclusion that Pace shot and killed Hargrove. Instead, the issue is whether the evidence supports the conclusion that Pace was with Jones on that fateful night when Hargrove was shot and killed. As the trial court explained to the jury in its final charge, the jury could find Pace guilty for felony murder under a complicity-liability theory. (R. 1560-61.) This charge is consistent with § 13A-6-2(a)(3) ("he, or another participant..., causes the death of any person"). Therefore, if the evidence supports that Pace was present for the purpose of robbing Hargrove at the time Hargrove was shot and killed, even if Jones fired the fatal shot, Pace is still guilty of felony murder.
Pace's contention that evidence of the collateral crime may not satisfy the *350 "substantive" corroborative requirement is unfounded. This Court has previously stated that, as a rule, "`"collateral crimes may not be used as substantive evidence of guilt of the defendant."'" Johnson v. State, 820 So.2d 842, 861 (Ala.Crim.App.2000), quoting Tyson v. State, 784 So.2d 328, 344 (Ala.Crim.App.2000), quoting in turn Copeland v. State, 455 So.2d 951, 954-55 (Ala.Crim.App.1984). "`"However, there are several exceptions to this general rule,"'" including where the identity of the accused is at issue. Johnson, 820 So.2d at 861-62. In such a case, such as here where the defendant denies he committed the charged crime, the collateral crime evidence may be considered as substantive evidence of the defendant's guilt where the crime was "`"committed `in the same novel and peculiar manner' as the crime for which the accused is now charged."'" Johnson, 820 So.2d at 862. Similarly, in Ex parte Baker, 780 So.2d 677, 679-80 (Ala.2000), the Alabama Supreme Court wrote:
"Rule 404(b) provides that evidence of a collateral act by the defendant is not admissible to prove the bad character of the defendant. `"Evidence of prior [or subsequent] bad acts of a criminal defendant is presumptively prejudicial to the defendant."' Bolden v. State, 595 So.2d 911, 913 (Ala.Crim.App.1991), cert. denied, 595 So.2d 914 (Ala.1992) (quoting Ex parte Cofer, 440 So.2d 1121, 1124 (Ala.1983)). However, such evidence is admissible for other material purposes, including proof of identity. Rule 404(b). Collateral-act evidence is admissible to prove identity only when the identity of the person who committed the charged offense is in issue and the charged offense is committed in a novel or peculiar manner. C. Gamble, McElroy's Alabama Evidence § 69.01(8) (5th ed.1996); Ex parte Arthur, 472 So.2d 665 (Ala.1985); and Robertson v. State, 680 So.2d 929 (Ala.Crim.App.1994). `Under the identity exception to the general exclusionary rule prohibiting the admission of other or collateral crimes as substantive evidence of the guilt of the accused, the prior crime is not relevant to prove identity unless both that and the now-charged crime are "signature crimes" having the accused's mark and the peculiarly distinctive modus operandi so that they may be said to be the work of the same person.' Bighames v. State, 440 So.2d 1231, 1233 (Ala.Crim.App.1983) (emphasis added). `[E]vidence of a prior crime is admissible only when the circumstances surrounding the prior crime and those surrounding the presently charged crime "exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person."' Ex parte Arthur, 472 So.2d at 668 (quoting Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.1983)). See also Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); and Govan v. State, 40 Ala.App. 482, 115 So.2d 667 (1959) (recognizing that the identity exception is applicable only where both the prior crime and the charged offense were committed in the same special or peculiar manner).
"Regarding the admissibility of Rule 404(b) evidence to prove identity, the United States Court of Appeals for the Eleventh Circuit has stated that a court must determine that:
"`(1) the evidence is relevant to an issue other than defendant's character; (2) there is sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the extrinsic act; and (3) the evidence possesses probative value outweighing any prejudicial effect.'
"United States v. Clemons, 32 F.3d 1504, 1508 (11th Cir.1994), cert. denied, 514 *351 U.S. 1086, [115 S.Ct. 1801,] 131 L.Ed.2d 728 (1995). `When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused.' Id. at 1508 (quoting United States v. Miller, 959 F.2d 1535, 1539 (11th Cir.19920) (quoting United States v. Beechum, 582 F.2d 898, 912 n. 15 (5th Cir.1978) (en banc))). See also United States v. Cardenas, 895 F.2d 1338, 1343 (11th Cir.1990); and C. Gamble, McElroy's Alabama Evidence § 69.01(8)(stating that a greater degree of similarity between the charged offense and the collateral act is required for admissibility to prove identity than for admissibility to prove intent or knowledge)."
(Footnote omitted.)
While the Alabama Supreme Court concluded that the collateral evidence in Baker, 780 So.2d at 680, did not establish that the crimes were committed in a "unique, novel, or peculiar manner," the collateral crime evidence in the present cause established that the same location was robbed on two occasions within a matter of a few weeks of each other; that Pace and Jones committed the first robbery; that Pace committed another robbery at a motel in Clanton within 48 hours of the December 1991 robbery of the Days Inn motel; that the same weapon used to shoot the victims in the Clanton robbery was also used to shoot Hargrove; that Pace kept two or more weapons in the glove compartment of his car; and that Pace would and did shoot victims who resisted his robbery attempts. This evidence, though circumstantial in nature, is sufficient to corroborate the testimony of Linda Jones that Pace was present during the attempted robbery and murder of Hargrove. In McGowan v. State, [Ms. CR-95-1775, Dec. 12, 2003], ___ So.2d ___, ___ (Ala.Crim.App.2003), we observed that the State is not required to produce corroborative evidence of each element of the offense or of each fact testified to by the accomplice; rather, the State is only required to present "other evidence" that connects the defendant to the offense. In concluding that sufficient corroborative evidence was produced by the State, we wrote: "We need look no further than the independent-witness testimony that [the defendant] procured the murder weapon shortly before the crimes and that he and [an accomplice] fled to other states following the murders." See also Johnson v. State, 820 So.2d at 869 ("When the testimony of the accomplice is subtracted, the remaining testimony does not have to be sufficient by itself to convict the accused."). In this case, Pace's connection to the murder weapon and to the Days Inn motel, where the murder occurred, is sufficient corroborative evidence of his guilt.
The trial court's denial of Pace's motions for a new trial and for a judgment of acquittal was not error. The judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
NOTES
[1] This was Pace's second trial on capital-murder charges. See Pace v. State, 714 So.2d 316 (Ala.Crim.App.1995), on return to remand, 714 So.2d 320 (Ala.Crim.App.1996), rev'd in part, 714 So.2d 332 (Ala.1997).
[2] "[I]n a criminal case, a motion for new trial filed within 30 days after conviction or sentence is not waived by a notice of appeal, `regardless of the sequence in which the notice of appeal and the motion are filed.'" Ex parte Walker, 652 So.2d 198, 199 (Ala.1994) (quoting Melvin v. State, 583 So.2d 1365, 1367 (Ala.Crim.App.), on return to remand, 588 So.2d 939 (Ala.Crim.App.1991)).
[1] Clyde Cook admitted that he was a convicted drug dealer and that he was serving time in prison at the time of trial, that he was a former lover of Jones's, and that he had "used" Jones and other women. (R. 2328-30.)
[2] Pace's counsel also eluded to a prior trial. On countless occasions, during cross-examination of witnesses, he referred to a "transcript" of "sworn testimony," and on one occasion while reading from the transcript, Pace's counsel asked Dwight Hale, a Decatur police officer: "And the next question was, `Did you hear [Linda Jones] tell the jury that,' and what is your answer." (Emphasis added.) (R. 2205.)
[3] Pace "does not contest the admission of the Rule 404(b) evidence," but notes that "it was admitted for a limited purpose and not as substantive evidence." Brief of appellant at 44.
[4] A .38-caliber Ruger revolver, with the hammer cocked, was found near Hargrove's body. (R. 1616, 1665.)